WILL OF PATTISON.

*January 12—June 21, 1926.*

*Appeal and error: Jurisdiction of supreme court: Appeals from
findings or opinion of trial court: When final in nature:
Trusts: Regular reports of trustees: Review on closing of
estate: Intermediate determinations: When conclusive: Pow-
ers of trustee: Restriction against sale in trust: Enforcement:
Provision for sale of buildings in long-time leases: Appoint-
ing trustee to handle insurance moneys.*

1. The supreme court cannot obtain jurisdiction of attempted ap-
peals unless the proceedings below are within the statute
regulating appeals; but it is the substance and nature of the
proceedings, rather than the name given to them either by the
court or the parties, that must be considered in determining
the question of appealability.   p. 296.

2. An appeal cannot be had from the findings of the court; but
a writing filed by the trial court which consisted of his
"opinion or decision," with a full discussion of all the ques-
tions involved and of the authorities bearing upon such ques-
tions, in an application by trustees under a will to have their
annual reports allowed and approved, after notice to all in-
terested, may be properly treated as an order passing upon
and determining the issues raised as to the accounts of the
trustees, and appealable under sec. 324.01, Stats. 1925.   p. 298.

3. If the annual accounts of the trustees under a will which re-
quired them to file their accounts with the county court in
the same manner as is to be done by guardians be merely
filed in the county court, no hearing upon due notice and no
judicial action thereon being had, such accounts are sub-
ject to supervision, allowance, or disallowance by the court
when closing the estate.   p. 298.

4. However, where such accounts are duly filed at intervals prior to final settlement, and petition is made for their examination and allowance, notice given to those interested, and judicial action taken, any determination by the court upon the questions raised and presented on the hearing becomes final and conclusive unless challenged on appeal, and the time for appealing therefrom then begins to run. p. 298.

5. A lease under the terms of which the lessee paid the lessor certain amounts which were distributed to the present beneficial owners of the fee, and agreed to pay an additional amount if under certain terms of the lease the buildings on the real estate became the property of the lessee, but if such conveyance was not made the lessee should be credited with such first payment, is *held* to have been in excess of the powers of the trustees under the will, which provided that they should not sell the real estate on which the buildings were located, or settle for any royalties or rentals until such became due; and the restriction will be enforced by the court even though the leasing may have been advantageous as a business transaction. p. 301.

6. A provision in the will that the trustees should not have power to sell the real estate includes the buildings and improvements thereon. p. 301.

[7. Whether provisions in leases relative to renewal or extension, together with the surrounding circumstances, warranted the finding of the trial court that they exceeded the limitation of fifty years expressed in the trust, not passed upon.] p. 301.

8. A provision in the lease appointing a bank as trustee to collect, hold, and disburse any insurance funds, is not improper as a delegation of the functions of the trustees and a surrender of their powers. p. 302.

DOERFLER and ROSENBERRY, JJ., dissent.

APPEAL from an order of the county court of Douglas county: WILLIAM E. HAILY, Judge. *Modified and affirmed.*

William H. Pattison died testate at Superior, Wisconsin, November 10, 1910, leaving a large amount of property, including real estate in said city, in Duluth, Minnesota, and elsewhere.

The widow and two others were appointed executors, their accounts as such settled and allowed October 5, 1911,

and the widow and two sons thereafter, as trustees, pursuant to the terms of the will, continued to administer the estate.

The will contained many directions and restrictions as to the duty and upon the power of the trustees. Among such provisions are the following:

"They shall not have the power to sell, convey, or mortgage the real estate, or any part thereof, save as hereinafter provided; and they shall not lease any portion of said real estate for a period exceeding fifty years, but in their discretion they may lease any portion of said real estate for a period not exceeding that time, on such terms as shall seem proper; but they shall not receipt or settle for any royalties or rent until such royalties and rent shall become due; and they may sell and convey any part of the real estate belonging to my estate; . . . except . . . any property which I may own situate on Superior street, in the city of Duluth, in said state of Minnesota."

December 12, 1921, upon a petition and due proceedings had for the construction of certain parts of said will, the court, among other things, "finds, decides, and adjudges that said will does not give, grant, or convey unto said trustees the power or authority to sell the real estate owned by the deceased at the time of his death, situated on Superior street in the city of Duluth in the state of Minnesota." From this no appeal was taken.

The trust was therein declared to be at an end for all purposes when the youngest child shall arrive at the age of twenty-eight years, which will occur in August, 1926. The trustees are enjoined by said will to manage and administer the estate in the same manner, as near as may be, as guardians of estates of infants are directed to do in like cases in this state, who are required to make annual report of their doings with the estate to the widow while living and to each of the children as they successively reach the age of twenty-one years, and in the same manner and to

the same effect as guardians are required to make their annual report concerning the estate of their wards by the laws of this state.

In October, 1923, a hearing was had in county court upon the petition of the trustees to have allowed and approved their certain annual reports covering the years 1911 to 1922, both inclusive, involving certain leases of three several pieces of real estate with improvements, all situated on Superior street in Duluth. One such was of the New Jersey building to Polinsky and Ribenack, the second of the Haug building to one Kris, and a third of the Giddings building to the Kelley Hardware Company.

The parts deemed material here of the lease dated November 15, 1922, of the New Jersey building are summarized as follows:

The term first recited is for forty-nine years from December 1, 1922.

The rent: For the first ten years $10,000 per year. Thereafter an increased rental upon valuations of the land exclusive of improvements for successive ten-year periods; also,

Beginning December 1, 1922, and ending on the date when the buildings and improvements on said premises shall be sold and conveyed to the lessees or shall become their property if such sale be made the end of the lease, if such sale be not made a further annual sum of $5,100; also,

All taxes and assessments on the real estate, etc.; also the cost of insurance (with provisions making a national bank of Duluth trustee as to insurance moneys).

A further provision recited: The lessees at the time of making the lease paid to the lessors $30,000 and will pay the additional sum of $55,000 in certain annual payments with a balance of $3,000, only if and when the buildings and improvements shall be conveyed to or become the property of the lessees (provisions being made as to interest);

that the lessees agreed that whenever within one year after December 1, 1935, and after certain specified events the owners shall give good title to the lessees of the buildings and improvements, the lessees will pay the $3,000 balance aforesaid, and thereafter said buildings and improvements shall be the property of the lessees subject to the terms and conditions of the lease. The failure to pay such $3,000 or to accept such conveyance within sixty days of its tender shall constitute a breach of the lease by the lessees. If such conveyance be not then made and if the lessees shall not have then become owners of the buildings and improvements by other terms of the lease, then they shall be credited with the said $30,000 and the other payments aforesaid. The lessees were to indemnify lessors in certain cases of improvements, etc.; and had the right to erect independent buildings.

The lessees agreed to repair or rebuild in case of partial or total destruction of the buildings, etc.

In case of a new building it is to be at a cost of not less than $85,000, etc. If, in certain contingencies, lessees erect a new building, they shall become the owners thereof forthwith (with provisions relating to the $55,000 and the $5,100 annual payments aforesaid).

Also, that upon termination of the lease the lessees will surrender possession and all buildings and improvements shall become the lessors' absolute property upon compliance, however, with the following terms: that at the end of the forty-nine years the lessors will pay the lessees the full amount of the value of the buildings and improvements then on the premises at a price to be determined by appraisal; provided further, that in lieu of such payment the lessors may give, before the term ends, an option to extend said lease for forty-nine years more upon revaluation rentals. If lessees fail to accept such option, if tendered, then lessors need not pay the lessees for said buildings as

above provided.   If lessees accept the option, then the lessors will pay lessees, at the end of the extended term, fifty per cent. of the then value of the buildings and improvements.

Provision was made permitting, under certain conditions, the payment of rentals to a trustee instead of to the lessors and to be invested and held as security for the lessees for contemplated improvements and new buildings.

The Kris lease for the Haug building was executed March 15, 1922, was similar except as to amounts, and presents the same questions as the foregoing.

The Kelley Hardware Company lease was dated January, 1920, and was for a term of only forty-nine years.

Many objections were interposed to the trustees' reports by respondent, eldest daughter of deceased and a nonresident.

A great amount of testimony was taken, and upon the entire matter thus presented the county judge on September 25, 1924, filed his "opinion or decision," with a very full discussion of the questions involved and of the authorities bearing on the same.   It covers over forty pages of the printed case and is not in the usual and recognized form of findings of fact and conclusions of law.

The trial court expressed the opinion that the three above described were practically ninety-eight-year leases.   He also recited that he was passing upon all the matters involved in the account so far as they affect violations of the trust, "in order that both parties may have the complete consideration and judicial findings, upon which to regulate their conduct or consider any remedy hereafter."   He disapproved of these three leases on several grounds hereinafter discussed, but expressly disclaimed jurisdiction to set them aside, and disapproved of a number of items in the accounts, and closed by saying, in effect, that the findings and adjudications would be subject to correction on motion of counsel as to any inaccuracies or erroneous applications.

On October 2d the trustees filed some fifty-eight excep-
tions "to the findings of the court made and filed in this
proceeding upon September 25, 1924," etc., and on the
same day gave notice that the said trustees and each of
them, "being aggrieved by the determination and order of
said county court rendered upon," etc., "appeal from such
determination and order, and from the whole thereof," to
this court. No other order or determination upon these
accounts appears in the record.

Upon argument here the trustees have abandoned all the
matters covered by their exceptions and appeal above re-
cited except the questions involved as to the validity of the
three leases.

For the appellants there were briefs by *Hanitch, Hartley
& Johnson* of Superior, and oral argument by *Louis Han-
itch* and *C. J. Hartley.*

For the respondent there was a brief by *A. E. M'Manus*
and *W. M. Steele,* attorneys, and *Steele & Tipton,* of coun-
sel, all of Superior, and oral argument by *Mr. Steele.*

The following opinions were filed February 9, 1926:

ESCHWEILER, J. The respondent challenges the right
of the appellants to be now heard on the ground that this
court has no jurisdiction to hear and determine because of
lack of an appealable order. Appellants, by their notice of
appeal recited above, treat that which was designated by
the trial court as his "decision and opinion" at the com-
mencement, and his "findings and adjudications" at the
end thereof, as an order merely and not as in the nature of
a determination or judgment.

Unquestionably it would have been better practice to have
had the lengthy opinion and decision of the trial court fol-
lowed by concise findings of fact and conclusions of law
or by a brief determination or order upon the several pre-
cise issues presented before any appeal should have been
attempted to this court. We think the trial court evidently

expected such procedure was to be followed from the expressions in his opinion cited above. The appellants, however, promptly filed their many exceptions to it, and took their appeal therefrom, treating it as an order rather than as being in the nature of a judgment or final determination, and have thereby presented quite a troublesome question.

There is a substantial difference in substance, and should be in form, between orders or rulings of a trial court made during the proceedings, and which generally are not the subjects of the statutory right of appeal to this court, and his findings of fact and conclusions of law upon which a final determination or judgment can properly and regularly be entered, and upon appeal from which judgment prior orders in the proceedings may also be reviewed.

The importance of determining the nature of that from which an appeal purports to be taken is evident when considering the many and recent times in which it has been declared that this court cannot obtain jurisdiction of attempted appeals except and unless the proceedings below and attempted to be reviewed are within the statute regulating appeals. *Puffer v. Welch,* 141 Wis. 304, 124 N. W. 406; *Puhr v. C. & N. W. R. Co.* 168 Wis. 101, 103, 169 N. W. 305; *Walters v. Eakins,* 172 Wis. 626, 179 N. W. 781; *Hempel v. Hempel,* 174 Wis. 332, 341, 181 N. W. 749, 183 N. W. 258.

It is its substance and nature, rather than the name given to the proceeding either by court or parties, that must be the criterion in determining the question of appealability. *Lemon v. Aronson,* 166 Wis. 146, 164 N. W. 820; *Tormey v. Gerhart,* 41 Wis. 54, 57; *Boynton v. Sisson,* 56 Wis. 401, 402, 14 N. W. 373; 33 Corp. Jur. 1053; 15 Ruling Case Law, 571. If we consider the "opinion and decision" as being in the nature of findings, as it evidently was considered by the trial court, then it had not yet ripened into anything appealable. *Tellett v. Albregtson,* 160 Wis. 487,

491, 152 N. W. 152; *Menasha v. Wis. T., L., H. & P. Co.*
161 Wis. 605, 155 N. W. 142; *Greeney v. Greeney,* 163
Wis. 377, 379, 157 N. W. 1097; *Baker v. Bohnert,* 158
Wis. 337, 338, 148 N. W. 1093.

Appeals from the county court directly to this court are
taken under the provisions of sub. 2, sec. 4031 (now sec.
324.01, Stats.), created by sec. 1, ch. 183, Laws of 1919,
providing as to certain counties, including Douglas county,
that any person aggrieved by any "order, judgment, decree,
determination or denial of the county court shall have the
right to have the same reviewed by writ of error or appeal
from the county court to the supreme court." This statute
has been construed in the following opinions: *Estate of
Beyer,* 185 Wis. 23, 200 N. W. 772, involved an order of
the county court overruling a pleading, designated a demur-
rer, to a claim filed therein, and it was by this court held
that an appeal would not lie from orders merely directory
in the course of probate proceedings nor from orders not
appealable under the provisions of sec. 3069, Stats., the one
providing for appeals here from the circuit court, the ma-
terial parts of which as to certain appealable orders reading
as follows:

"(1) An order affecting a substantial right, made in
any action, when such order in effect determines the action
and prevents a judgment from which an appeal might be
taken.

"(2) A final order affecting a substantial right made in
special proceedings or upon a summary application in an
action after judgment."

In *Estate of Harter,* 187 Wis. 90, 203 N. W. 720, an
appeal was attempted from an order declaring the validity
of adoption proceedings, and it was held that from such an
order, being no part of a final decree distributing the es-
tate, there could be no appeal; and in *Will of Hughes,* 187
Wis. 14, 203 N. W. 746, the right to review here an order

of the county court correcting its minutes and records was denied.

If, therefore, the writing filed by the trial court on September 24th be considered as findings, we are without jurisdiction to review it. We reach the conclusion, however, that it may be properly treated as in substance an order, after hearing and upon due notice to all interested, passing upon and determining the issues raised as to the accounts of the trustees for the several years from 1910 to 1922 inclusive, none of which accounts had been approved and allowed or passed upon before this hearing.

There still remains a question as to whether or not, if it be considered such an order, appeal to this court can be had under sub. 2, sec. 4031, *supra*. Under the express terms of the will in this case the trustees were required, as is recited above, to file annual accounts with the county court in the same manner as is to be done by guardians in the county court. If such annual reports be merely filed therein and no hearing upon due notice and no judicial action taken thereon, such accounts are still subject to supervision, allowance, or disallowance by the court when closing the estate, for ordinarily the entire subject of handling the estate from beginning to end is then still open for consideration. *Estate of Wells,* 156 Wis. 294, 312, 144 N. W. 174. On the other hand, where accounts are duly filed at intervals prior to final settlement, petition made for their examination and allowance, notice given to those interested and judicial action taken, any determination by the court upon the questions raised and presented on such hearing becomes final and conclusive unless challenged on appeal, and the time for appealing therefrom then begins to run (*Will of Rice,* 150 Wis. 401, 458, 136 N. W. 956, 137 N. W. 778), that opinion further stating (p. 467) that such an order protects the executors who act in good faith thereon, not bar-

ring, however, any remedy that there may be against third persons improperly benefiting by such orders.

In *Schinz v. Schinz,* 90 Wis. 236, 63 N. W. 162, cited in *Will of Rice, supra,* several accounts were filed and allowed, one in 1888 fixing the compensation of the executor, and such determination was held final and conclusive, except for fraud or mistake, when the review was had on the final account in 1891 (p. 248).

A similar view was expressed as to the lack of right of one to review, at the time of entry of final decree, a sale of a homestead by an executor becoming interested therein, where the sale had been made several years before and then confirmed by the court, the title to the real estate involved having in the meantime vested by lapse of time in the purchaser. *Will of Hoya,* 173 Wis. 196, 205, 206, 180 N. W. 940.

A Massachusetts statute provides that upon every settlement all former accounts may be opened to correct any mistake or error therein, except that any matter formerly heard and determined shall not again be brought in question without leave of court. This statute is said to be merely declaratory of the general rule in *Wiggin v. Swett,* 6 Met. (47 Mass.) 194, 198. The same ruling was had in *Bennett v. Pierce,* 188 Mass. 186, 189, 74 N. E. 360, holding that prior accounts may be passed upon in succeeding accounts for fraud or mistake only. In *Lanman v. Lanman,* 206 Mass. 488, 491, 92 N. E. 885, it was held that a former account, not having been allowed at the time it was filed, was still open for revision when the final account was presented many years thereafter.

As a result of this view that the opinion and decision of the trial court of September 24th is in effect and substance an order disposing of the questions raised upon the several annual accounts, the petition to have the same allowed and

approved, and the objections by the respondent, then it follows that such order becomes final and conclusive upon the parties concerned, subject to right to review upon appeal, and cannot thereafter be challenged in the county court in future proceedings except for fraud or mistake. While such a proceeding as we are now reviewing may not literally meet the provisions of sec. 3069, Stats., cited above, for though it does not determine an action and thereby prevent a judgment from which an appeal might be taken under sub. (1) of said statute, were county court proceedings considered as being an action, nevertheless, this being a final order so far as the accounts were concerned, may well come within the second subdivision, *supra*, as affecting a right in a special proceeding. We do not now determine, because unnecessary, whether what was done in the court below was done in "an action" or in a "special proceeding," as the two are differentiated in sec. 3069, *supra*, and in secs. 2593–2596 inclusive (now secs. 260.01 to 260.04). That the filing of a claim in county court does not constitute an action at law or suit in equity was held in *Estate of Beyer*, 185 Wis. 23, 28, 200 N. W. 772, *supra*. We deem it sufficient to say that the present proceeding is appealable under sub. 2, sec. 4031 (now sec. 324.01), *supra*. The motion to dismiss the appeal must be denied.

Upon the merits we are of the opinion that the trial court was right in holding as to the leases of the New Jersey and Haug buildings that the trustees so exceeded their authority and powers under the written trust that their accounts, so far as involved in such leases, cannot be approved.

The trustees received, as accounted for in their report for 1922, net cash for the sale of the New Jersey building of $23,030.27 (being the $30,000 first payment less taxes), and $6,247.50 on the sale of the Haug building, and substantially these amounts were distributed that year to the various beneficiaries. Under these leases this was very

plainly a present payment on an agreement to sell the buildings and improvements in an attempted theoretical separation of the same from the real estate. That the trustees had no such power under the terms of the will and the judgment construing the same is very clear. These pieces of property on Superior street, Duluth, they were expressly prohibited from selling. Such restriction was an entirety, and necessarily extended to the buildings and improvements then part of the real estate in the eye of the law. However advantageous as a business transaction such provision in the lease may have been, it was a plain violation of the letter and spirit of the limitation imposed by the testator upon the powers of the trustees. This being a lawful restriction, the court supervising the trust can but enforce it.

That these amounts with others subsequently to be paid on the agreed price for these improvements might have to be thereafter refunded by owners or lessors to these lessees is entirely immaterial. It was presently distributed to the present beneficial owners of the fee as proceeds from sale of an interest in real estate and must be so considered.

If under any construction of this feature of the lease these payments for the buildings and improvements could be considered as in the nature of advance rentals, then they cannot be approved because violating another condition of the trust, viz. that prohibiting the receiving or settling for rents or royalties until they shall become due.

The trial court also held that the leases were subject to disapproval because he considered them in effect leases for ninety-eight years and therefore beyond the limitation of the fifty years expressed in the trust. However, in view of the disposition we have made of this matter on the foregoing grounds, it is not necessary to pass on that feature, though there is much in the conditions of the leases, particularly in connection with the provisions for the renewal or extension and all the surrounding circumstances, to war-

rant the trial court's conclusions that the parties intended to evade or avoid the limitations of the trust in that regard.

Respondent contends that the provision in the leases for the appointing of a bank as trustee to collect, hold, and disburse any insurance funds is such an attempted delegation of the functions of the trustees and surrender of their powers that it ought not to be approved. We do not, however, view it as subject to condemnation. As between lessor and lessee it is very proper to appoint some disinterested person to do such thing. In this case especially, where the trust as such must terminate by its own terms, and the trustees who made such leases cease to act at almost the very beginning of such long terms, the designation of a third person to then act when manifestly the trustees cannot is not subject to serious criticism.

During the hearing and at the time of the trial court's decision it was assumed that the third lease involved in the accounts, viz. that of the Giddings building to the Kelley Hardware Company, was similar to the others. It appears, however, that it is substantially different and but for forty-nine years. As to that lease, therefore, the ruling below must be reversed.

*By the Court.*—Order modified by affirming as to the New Jersey and Haug building leases, and reversing as to the Kelley Hardware Company lease. Respondent to have costs here.

DOERFLER, J. (*dissenting*). In its decision the county court, in speaking of the Polinsky lease, says:

"This lease is well drawn in other respects to carefully describe the interests of the lessors and beneficiaries of the trust, anticipating as it does every emergency, and the reservations and powers under it are ample to enforce and protect their rights, and, under the evidence submitted, it seems to be considered a profitable transaction in the end for the

estate, and therefore no criticism could be made on that ground against it."

Long-term leases of valuable real estate in the larger cities of the country, and especially where the property by reason of its advantageous location is in the ordinary course of events destined to increase in value, have become quite common, and the advantages both to lessors and lessees in such an undertaking have generally been recognized.   This attitude toward such leases existed not only in the year 1908, when the will of the testator was executed, but for a considerable period of time prior thereto.

The testator at the time of his death was the owner of some of the most valuable real estate situated in the principal retail district in the city of Duluth, which city, on account of its advantageous location (being at the head of the Great Lakes), and owing to the large northwestern territory tributary thereto, had become a leading commercial and manufacturing center.   It is a growing, prosperous, and progressive city, and possesses many of the aspects so noticeable in larger cities like Chicago and New York.   The enterprise of its inhabitants and their civic pride are manifested by the many beautiful business structures erected, and by their determination to maintain the local prestige of the city, notwithstanding the great obstacles with which they are confronted, owing to the natural elevation of the land upon which the city is built.

It has been the experience of all large cities that retail as well as wholesale districts are subject to great changes; the retail districts are oftentimes converted into wholesale districts, and *vice versa;* that residence districts are in the course of growth and development transformed into industrial districts; and that such changes are productive of fluctuations in value and affect the market value of properties.   It has also been a common observation that the ad-

vancement or retrogression of values is largely dependent upon the enterprise or lack of enterprise of the owners of property in either building or failing to build modern structures in localities desirable for business purposes.

When, therefore, the testator, who was a resident of the city of Superior, in the year 1908 executed his will, it must be assumed that he had in mind all of the things heretofore referred to, and that it was his desire to perpetuate the prestige of his property, from the standpoint of value, to a degree commensurate with the possibilities that were inherent in his holdings.   Two of the buildings upon the leased property at the time of the making of the long-term leases were no longer new or modern buildings.   One was twenty-four years old and one was thirty years old.   In the rapid growth and development of cities in this country, buildings standing over a quarter of a century are considered antiquated.   New modes of construction, resulting from the ingenuity of man, are constantly employed, and it is the tendency of mercantile establishments to flock towards the more modern and attractive structures.   When, therefore, the testator made his will he realized the advantageous location of his property on Superior street in the city of Duluth and expressly prohibited the sale of such property, in order that his vision of enhancement and development might materialize for the benefit of those who succeeded him. That the testator was a successful business man is evidenced by the large holdings left by him and the judgment he exercised in becoming the owner of the properties in Duluth referred to.

But, while he prohibited a sale, he did expressly authorize a long-term lease, not to exceed fifty years.   Any lease of property beyond a ten-year period is considered a long-term lease.   We are familiar with the usual and ordinary terms of short-term leases, and all of us have a greater or lesser degree of knowledge of the usual and ordinary pro-

visions contained in long-term leases. One has but to casually read the outlines of a long-term lease as it is set forth in the standard form books to appreciate that such a lease involves innumerable considerations for the mutual protection of the parties. Every conceivable situation that may arise during such a term is carefully considered and dealt with, and protective features are inserted in contemplation of the many changes that may transpire during the period covered by such a lease.

I have carefully read the leases herein involved, and I heartily agree with what the learned county judge has said upon the subject of this lease. In brief, the able counsel who drew the lease has incorporated therein every conceivable and available advantage to his clients that he could command.

One of the principal objections advanced by the respondent's counsel to this lease is aimed at the *term* of the lease, it being his contention that in effect the lease is for a period in excess of fifty years, and that therefore it violates the express provisions of the will and is void. For instance, the Polinsky lease contains a provision as follows:

"To have and to hold the said demised premises with the appurtenances thereunto belonging unto said lessees, their heirs, representatives, and assigns, for the term of forty-nine (49) years, commencing on the 1st day of December, 1922, and terminating on the 30th day of November, 1971."

The lease further provides:

"It is hereby understood and agreed that if the lessees fully and completely carry out and fulfil the obligations by them undertaken hereunder for the full term of forty-nine (49) years, then the lessors will pay to the lessees for and on account of the building or buildings and improvements then on said leased premises owned by the lessees an amount equal to the full value thereof, to be determined by appraisers who shall be selected and appointed with power to act in the manner hereinbefore provided for the determi-

nation of the value of the land, the time for appointment of appraisers to commence April 1, 1971; provided, however, that the amount to be paid for and on account of the building or buildings and improvements shall in no event exceed the replacement cost thereof at the time of said appraisal, less a proper depreciation, under the circumstances, for physical deterioration, age, style, and obsolescence, it being hereby agreed that said sum shall be the maximum value."

The lease then contains an option whereby the lessors may offer the lessees an extension of the lease for forty-nine years, and if such option is not accepted the lessors are relieved from paying for the improvements; but if it is accepted the lessors are required to pay one half of the value of the improvements at the end of the extended term, such value to be determined also by appraisal in the manner and form heretofore indicated.

This lease was drawn not many years before the expiration of the trust created under the will; therefore at the time of the expiration of the forty-nine-year term the trustees will be relieved of their trust and the property will be held by the beneficiaries and their successors in interest under the will. The lease in question primarily runs for a period of forty-nine years, and at the end of this time it terminates unless the then owners conclude to exercise the option therein provided; so that it leaves the beneficiaries to act entirely in accordance with their volition. If they deem it advisable, when the proper time comes, to exercise their option, the result will be that they will either get the building on the premises free from any charge therefor, or they will obtain a valuable extension of the lease for an additional term of forty-nine years. This option contained in the lease is not only of great value, from a practical business standpoint, to the beneficiaries, but also permits them to declare the lease at an end at the end of forty-nine years, to the same effect as though no provision whatsoever for an option or extension were contained therein. It is there-

fore merely a forty-nine-year lease, and is strictly within
the limitations contained in the will.

By agreement between the parties to the lease the value
of the buildings involved in the Polinsky lease was fixed at
$85,000.   The lease contained a provision which author-
ized the lessees to purchase this building for the sum of
$85,000, the appraised valuation, by the payment of the
sum of $30,000, and by paying the balance in annual instal-
ments thereafter at the rate of $4,000.   The value of the
real estate by the appraisal was fixed at $200,000, and
under the terms of the lease the lessees are obligated to pay
by way of rental a sum equivalent to five per cent. upon
this valuation and five per cent. upon the valuations de-
termined at subsequent appraisals, it being agreed that the
valuations at no time shall be less than $200,000.   Until
the purchase of the building the owners will receive by way
of rentals an amount equivalent to six per cent. of the ap-
praised value of the building.   If a new building be con-
structed in place of the old building, the same shall cost not
less than $85,000.   The amounts to be paid to the lessors
are net, all tax burdens, insurance charges, etc., being pay-
able by the lessees.   Further, under the terms of the lease
the lessors are fully protected by a first lien upon the build-
ing and by the moneys derived from the sale of the old
building.   The transfer of the building to the lessees en-
ables them to remodel the same or to raze it and erect in its
place a new building, which, however, can be done only
when the new building shall be constructed at a cost of not
less than $85,000.   The reconstructed or new building, to-
gether with the leasehold interest, becomes of advantage to
the lessees and constitutes an asset, upon the strength of
which they can raise money by mortgage or otherwise.

While it is true that long-term leases differ in their terms,
such leases contain certain standard provisions, and among
such provisions is one which requires the lessor at the end

of the term to pay to the lessee the appraised valuation of the building at the end of the term. The lease involved in the case of *Upham v. Plankinton*, reported in 152 Wis. 275, 140 N. W. 5, provided for the payment by the lessors to the lessees of the appraised valuation of the new buildings erected, at the end of the term, the lessors being credited upon the amount of the valuation for the agreed amount of the value of the old buildings. In the instant case the appraised value of the buildings is paid to the lessors during the term of the lease, and the only vital distinction upon this subject existing between the two cases is referable only to the *time* of payment. In that respect it requires no persuasion to conclude that the terms of the instant case are more favorable to the lessors than those that were contained in the *Upham Case.*

But it is further argued that it was not the intention of the testator to create a situation whereby his beneficiaries would at the end of the term be burdened with such an extensive obligation as is involved in the raising of a fund sufficient to pay the appraised valuation of the building on the property at the end of the term. If, however, the testator did not contemplate such a result, it would have been easy for him to have expressly and definitely provided otherwise in his will; and not having so provided, we must assume that he had in mind the execution of the lease which in form contained the ordinary standard provisions of long-term leases.

In the *Upham Case* it was contended that the will did not authorize a long-term lease. This court, however, decided that while such a lease was not expressly authorized, in view of all the surrounding facts and circumstances it was authorized by implication. So that the instant case is stronger than the *Upham Case,* for in the instant case the testator expressly authorized a lease during a term not to exceed fifty years. The *Upham Case,* therefore, is decisive of the instant case.

When the question of a long-term lease was first advanced by the trustees a careful investigation was made of the subject.  Men of large experience in business matters of this kind were consulted.  The question was also submitted to eminent counsel, who approved of the lease.  Both the trustees and the counsel took a broad view of the subject, and they endeavored to discharge their duty in accordance with a conscientious desire not only to further the interests of the trust estate, but to act in accordance with the wishes and desires of the testator.  In brief, the trustees endeavored to perform their duties in a manner which in their opinion would meet with the approval of the testator were he alive.  Under these circumstances, the conclusions arrived at by the learned judge of the trial court would result in manifest injustice.  The only criticism to which the trustees can rightfully be subjected consists in their failure to appeal to the proper court having jurisdiction of the matter for advice and guidance.  But barring this consideration, I am of the opinion that they acted wisely and fully within their rights.  Undoubtedly they depended upon the advice of their counsel, whose opinion was based upon the decision of this court in the *Upham Case*.  They therefore did not proceed blindly or unadvisedly, but relied upon the decision in the *Upham Case,* and evidently concluded that a submission of the matter to the lower court would amount to a mere waste of time and an idle ceremony.

What has heretofore been said is directed principally to the Polinsky lease.  It is with equal force applicable to the Kris lease.  The Kelley lease has been approved by this court, and in approving this lease it took cognizance of the usual provisions of long-time leases.  The only point raised against the Kelley lease is the claim made by respondent's counsel that in authorizing an insurance trustee to collect the insurance in the event of a fire it unlawfully delegates part of the powers of the trustee to a third person.  This objection is obviated, in the opinion of the majority,

by a recognition of a standard provision in long-time leases. If we can recognize one standard provision in a long-time lease, why can we not with equal force and logic recognize other standard provisions?

I therefore respectfully dissent from the opinion of the majority.

Mr. Justice ROSENBERRY joins with me in this dissent.

A motion for a rehearing was denied, with $25 costs, on June 21, 1926.