Argued May 22, reversed June 10, 1959

# GIBSON *v.* GIBSON

340 P. 2d 190

*E. L. Crawford* and *Geo. A. Rhoten,* of Salem, argued the cause and filed a brief for appellant.

*Bruce W. Williams,* Salem, argued the cause for

respondent. With him on the brief was Otto R. Skopil, Jr., Salem.

Before LUSK, Presiding Justice, and SLOAN, O'CONNELL and CRAWFORD, Justices.

CRAWFORD, J. (Pro Tempore)

Defendant appeals from a decree awarding a divorce and alimony to his wife and disposing of property rights. Plaintiff sued on ground of cruel and inhuman treatment; defendant denied generally and by separate answers alleged desertion and cruelty.

The parties were married in Salem on November 8, 1929 and lived together until November 1953, when they separated. Differences were developing and defendant purchased a farm for plaintiff, borrowing $15,500 for this purpose. Plaintiff has since resided on this farm. They have two married adopted children. During their life together they accumulated substantial properties, real and personal, valued at approximately $100,000, subject to the $15,500 encumbrance above mentioned. Defendant has employment as Salem Manager of the Ladd & Bush Branch of the United States National Bank of Portland. His salary is substantial and is augmented by income from other sources, his aggregate income approximating $18,000 annually. Plaintiff is a housewife.

There is presented to us the issue of right to divorce, and, dependent on a conclusion that one or the other of these parties is entitled to a decree, the disposition of property and alimony. We shall first summarize the charges made by these parties and then discuss the evidence adduced in support of the same.

Plaintiff alleges defendant has "exhibited toward plaintiff a contentious and splenetic attitude, and has

continually, without cause, criticized plaintiff," has kept her awake by his "nagging," has threatened bodily violence to her and to their daughter's suitor, told plaintiff to "get out and stay out," has accused her of misconduct and "maintained an indifferent attitude toward her." We are given to understand this conduct began shortly following the marriage and continued until the parties separated. Defendant charges desertion and cruelty in that plaintiff has "cultivated an irritable disposition" toward defendant, has sought the company of "a man other than defendant," and "has harassed and impeded defendant in his business affairs in that plaintiff has refused to join with defendant in the making of income tax returns."

The only evidence offered in support of plaintiff's charges against defendant comes from plaintiff alone. She testified, in substance, that defendant "screamed" about bills the first month they were married, and continuously since. "He thought more about money than he did everything else." He reminded her she owed $40 "before we were married." He said she would "spend every cent he made," and that "these acts" occurred every month during the marriage. He said "everything he had was in spite of me, not because of me, and everything we had was his, not mine." When their daughter ran away he said, "No daughter of mine—she can't come back home—you can't bring her home." He said he was going to kill the daughter's suitor. He threatened to kill her, and said "if I left him, he would kill me. And a good many times he told me to leave, and * * * if I did leave, he wouldn't give me a nickel." Plaintiff testified further, "at night he would bang on my bedroom door" and insist on talking. And "if he didn't come in, he would bang the door open and stand there and look." In the summer of 1953 he cursed her

"the last time", saying, "God damn you, I wish you would get out." He called her a "bitch" on occasions but "I don't remember when." He accused plaintiff of having sexual relations with other men, and then withdrew the charge. Plaintiff testified that it was defendant's attitude that "his mother could do no wrong, and I would very seldom do right."

Defendant was called as an adverse witness and at that time, and also in presenting his own case, categorically denied all these charges without qualification, except as to cursing, which he did not recall.

In presenting his case defendant offered no evidence other than his own testimony, save as to the kissing incident involving plaintiff and one Eastridge. Plaintiff admitted this, testifying she might have kissed the man a dozen or more times. He was working about their home for a time, and on occasion plaintiff and this person did kiss and embrace. There is no evidence nor claim that this went any further. This is the basis for the charge that plaintiff sought the company of a man other than the defendant. So far as refusing to join in signing income tax returns is concerned, this was at a time when they were feuding and plaintiff did refuse to sign. This is the only example of "harassing and impeding defendant in his business affairs." Defendant testified that "She told me she was very dissatisfied on more occasions than one." Defendant's charge of desertion seems to be based on the fact that in 1953 plaintiff and defendant mutually agreed it would be best for her to move out of the home they were then occupying, and pursuant thereto, defendant purchased the farm which plaintiff has occupied up to the present time, borrowing the money for this purpose.

■ As hereinbefore observed, neither these charges nor counter-charges find any support in the record other than that supplied by the parties, save as to the kissing incident, and this involved but the one person and was not a promiscuous activity in which plaintiff indulged. The plaintiff explained in this manner:

"Q Was there ever anything improper of any nature between you and Mr. Eastridge?

"A There was never anything improper between us. I did kiss Mr. Eastridge, I will admit that. But if I hadn't had someone to confide in, someone to talk to, that one spring and summer, I don't know how I could have lived. And how the kiss started I don't know, but I did.

"Q Did you talk to Mr. Gibson about it?

"A Yes.

"Q What did Mr. Gibson say?

"A Well, he accused me of being immoral, and I said I wasn't and, 'You know I wasn't,' and he said, 'Yes, I know that you weren't.' "

We find nothing in this record justifying a decree to either party. Their long life together evidences no major conflict; skirmishes only. Dates of incidents are conspicuously lacking. Of course, if charges by plaintiff are proven, some would be serious. But, as stated, they are denied, and find little support in the record. Further, we must of course accept the principle that the burden of proof is on the one having the affirmative of the issue.

■■ In this case both plaintiff and defendant have assumed, but not discharged this responsibility. *Dakin v. Dakin*, 197 Or 69, 251 P2d 462; *Leahy v. Leahy*, 208 Or 659, 303 P2d 952. We recognize the weight to be given the conclusions of the trial court on disputed questions of fact, but equity cases are tried de novo and this court must be satisfied from its own independ-

ent examination of the record as to where the truth lies. *Nelson et al. v. Hampton et ux.*, 206 Or 573, 580, 294 P2d 329. And the court is limited in granting divorces to grounds stated by the statute (ORS 107.030(5) (6), desertion and cruel and inhuman treatment, as alleged in this case, upon adequate proof only. *Guinn v. Guinn,* 188 Or 554, 217 P2d 248, is particularly applicable to the case before us.

"Marriage under our law is a civil contract in which the state has a vital interest. It is not to be dissolved by mutual agreement nor for light reasons. It is still true that the integrity of the family is basic to our American civilization. 'The public policy relating to marriage is to foster and protect it, to make it a permanent and public institution, to encourage the parties to live together, and to prevent separation.' 9 R.C.L. 252, quoted with approval in Hodler v. Hodler, 95 Or. 180, 198, 185 P. 241, 187 P. 604. The marriage relation will be dissolved by the state for conduct of a spouse amounting to 'cruel and inhuman treatment or personal indignities rendering life burdensome.' § 9-907(6), O.C.L.A., as amended by Oregon Laws 1949, Ch. 154. It is cruel and inhuman treatment for which Mrs. Guinn indicts her husband. These are strong words, much watered down in these days of easy divorce. But they certainly do not comprehend every slight defect of character in a husband or a wife, nor every lapse from the highest standard of marital conduct. They suggest rather a purpose of one spouse to injure the other, or such gross and callous want of consideration for the sensibilities and legitimate wishes and interests of the other as to amount in law to such a purpose." *Guinn v. Guinn,* supra, at page 561.

See, also, *Dakin v. Dakin,* supra. Further, it may be added that the record discloses a mutuality of any fault which invokes the "clean hands" doctrine. *Riesland v.*

*Riesland,* 186 Or 227, 206 P2d 96; *Heisler v. Heisler,* 152 Or 691, 55 P2d 727; *Carmichael v. Carmichael,* 106 Or 198, 211 P 916; *Leahy v. Leahy,* supra; 27 CJS, Divorce, Section 67.

■ The relief sought must be denied because of lack of proof of misconduct justifying a divorce under Oregon statutes.

Reversed.